IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RALPH PRUITT,** | : | Civil No. 3:15-CV-1286 |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Magistrate Judge Carlson)** |
| v. | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Commissioner of the** | : | |
| **Social Security Administration** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**I.   Introduction**.

Social Security appeals entail a process of determining whether a complex array of medical challenges combine to render a claimant disabled. For Administrative Law Judges the method of adjudicating these claims frequently involves the formulation of a residual functional capacity (RFC) for the claimant based upon his or her credibly determined limitations, and then relying upon vocational experts to provide testimony regarding whether a person with these limitations could perform a significant number of jobs in the regional or national economy.

1

As a guide in this assessment, vocational experts typically rely upon a Dictionary of Occupational Titles (DOT) developed by the U.S. Department of Labor. While this Dictionary of Occupational Titles provides a detailed description of many jobs in our economy, given the complex nature of the economy, and the complicated set of limitations which individual disability claimants may face, on occasion there are discrepancies between the DOT job descriptions, and the workplace limitations experienced by a specific disability claimant. Where these discrepancies exist, it is the task of the vocational expert and the Social Security Administrative Law Judge (ALJ) to address those discrepancies, and provide a reasoned analysis of the claimant's ability to work which fully considers any such discrepancies and provides a reviewing court with an adequately developed legal and factual basis for reviewing a disability determination that involves a residual functional capacity assessment which does not neatly fall within any of the Dictionary of Occupational Titles job descriptions.

This is a difficult, and often challenging, but vitally important task in those cases where we must reconcile discrepancies between an RFC determination and the DOT standards for the jobs that an Administrative Law Judge finds the claimant could perform. In this case, we are presented with one such challenging case. The plaintiff, Ralph Pruitt, is a laborer whose employment prospects are now severely

limited due to two separate and very different impairments: chronic spinal problems and a profound degree of deafness. While the ALJ recognized that this array of conditions brought Pruitt's case well outside the ordinary parameters of jobs defined by the Dictionary of Occupational Titles, and endeavored to develop the factual record relating to the degree to which Pruitt's deafness impaired his ability to perform the limited set of jobs that Pruitt could still undertake given his severe back ailments, those efforts do not permit a fully informed analysis of this complex question, by either the ALJ or this Court. Therefore, for the reasons set forth below, we will remand this matter for further consideration of this question by the ALJ.

## II.  BACKGROUND AND PROCEDURAL HISTORY

On January 20, 2012, Ralph Pruitt, a 45 year old man with an eleventh grade education and a work history as a truck loader, pizza cook, and laborer, applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act due to profound deafness, back problems, and nerve damage to his legs. (Tr. 84-85, 185.) According to Pruitt these ailments had combined to render him disabled as of June 1, 2011.

With respect to Pruitt's hearing deficits, the undisputed medical evidence reveals that Pruitt suffers from a profound, and progressive, deafness which affects both ears. Thus, the medical evidence disclosed that on May 10, 2012, Dr. Carlos

Recalde, performed a consultative audiological examination of Pruitt. (Tr. 327.) Dr. Recalde noted that Pruitt began experiencing hearing loss at age 18, and it had worsened over time. (Id.) On examination, Pruitt displayed significant bilateral sensory neural hearing loss with speech audiometry affected due to moderately severe to profound hearing loss. (Id.)

Likewise, on March 13, 2014, audiologist Amy Freed wrote a letter to Pruitt's counsel explaining the results of this speech audiometry test conducted in May 2012. (Tr. 66, 450.) In this report, Dr. Freed explained that a Speech Recognition Threshold (SRT) is the minimum hearing level for speech at which an individual can recognize 50% of speech material. (Tr. 450.) Pruitt's SRT was 70 dB in each ear. (Tr. 450.) A Word Recognition Score (WRS), in turn, is the percentage of an individual's ability to understand one-syllable words at a comfortable listening level. (Id.) In Pruitt's case, he scored 80% in the right ear and 76% in the left ear at 100dB, a volume level that equates to the volume of noise produced by a gas powered lawn mower. Freed opined that if the Word Recognition Score examination was presented at normal conversational levels (40-55 dB), Pruitt would be expected to score 0% in each ear. (Id.) These findings were tantamount to a conclusion that Pruitt is entirely deaf at a normal conversational volume, and would have significant hearing comprehension only if the speech directed at him had a volume equivalent to the

sound generated by a gas powered lawn mower, an extraordinarily high volume of sound.

In addition, on July 26, 2012, Michael Murray, M.D., performed a consultative examination of Pruitt which noted that, although Pruitt used hearing aids for a period of time, he no longer believed they were helpful. (Tr. 335.) Dr. Murray also found that Pruitt had difficulty communicating with him orally during the examination, often asking him to speak louder, and recommended that Pruitt undergo a hearing test to determine the extent of his hearing loss. (Tr. 338.)

Finally, on August 7, 2012, as part of the initial disability determination process, Gregory Mortimer, M.D., reviewed Pruitt's medical records and performed an RFC evaluation. (Tr. 66-68.) With respect to Pruitt's hearing, Dr. Mortimer wrote that Pruitt had a history of progressive hearing loss since age 18; noted that an audiogram indicated Pruitt had bilateral sensorineural hearing loss with a right ear average pure tone threshold of 74.6dB, and a left ear average of 73.3dB; and found that Pruitt's word recognition on the right ear is 80% at 100dB, and 76% at 100dB on the left ear. (Tr. 66.) Given these profound hearing deficits, Dr. Mortimer recommended Pruitt avoid "even moderate exposure" to noise at work. (Tr. 68.)

It is against the backdrop of this medical evidence, uncontradicted medical evidence which cautioned against Pruitt's exposure to even a moderate level of noise,

that an Administrative Law Judge came to address Pruitt's case at a hearing conducted on December 17, 2013. (Tr. 24-59.) The ALJ conducted this hearing by video-conference and it became immediately apparent that Pruitt's hearing impairments made it impossible for Pruitt to hear or understand the ALJ. (Tr. 28-9.) As a result, Pruitt's counsel, who was present with Pruitt, was compelled to pose questions directly to Pruitt on behalf of the ALJ. (Id.) At the close of the hearing, the ALJ acknowledged Pruitt's total deafness, stating "I'm pretty sure Mr. Pruitt can't hear me." (Tr. 58.)

The ALJ also received testimony from a vocational expert to aid in determining whether Pruitt's back ailments, coupled with his profound hearing loss, precluded productive employment for the plaintiff. (Tr. 51-57.) In the course of the vocational expert's testimony, the ALJ fashion a residual functional capacity for Pruitt that limited him to light work with a sit/stand option every 30 minutes to accommodate his back impairments. (Tr. 52.) The ALJ then detailed Pruitt's "profound" hearing loss, (id.), and asked the vocational expert to assume that Pruitt could hear nothing at a normal conversation level and had only an 80% hearing comprehension when the workplace volume reached 100 decibels, a volume equivalent to a gas powered lawn mower. (Tr. 53.)

In response to this hypothetical the vocational expert testified that "it's a

narrow range of jobs that's appropriate" for Pruitt. (Tr. 54.) The vocational expert then identified the jobs of production work assembler, hand bander, sorter or inserter which the vocational expert testified Pruitt could perform, and which existed in significant numbers in the national economy. (Tr. 54.) The ALJ's questioning of this vocational expert recognized that Pruitt's back problems, coupled with his deafness, took this case outside the realm of the normal job descriptions defined by the DOT. Therefore, the ALJ asked if the vocational expert's opinion was consistent with the information in the DOT. In response, the vocational expert candidly acknowledged that her opinions were not entirely in accord with the DOT descriptions and explained why a sit/stand option would be available to Pruitt in the workplace. (Tr. 55.) As for Pruitt's deafness, however, the vocational expert only opined: "the details of the profound hearing loss are another issue. In general, of course the DOT discusses it, but not in detail like that." (Id.)

This aspect of the vocational expert opinion addressing Pruitt's profound hearing loss was problematic on several scores. First, the opinion did not take into account the fact that Dr. Mortimer, the consulting examiner who reviewed Pruitt's medical records, recommended that Pruitt avoid "even moderate exposure" to noise at work. (Tr. 68.) In addition, the vocational expert's suggestion that the DOT did not provide meaningful guidance relating to hearing deficits failed to take into

account that the Selected Characteristics of the Occupations Defined in the Dictionary of Occupational Titles, (SCO), does address ambient noise requirements for all of these positions, and indicates that all of the positions identified by the vocational expert entailed work site noise levels at or beyond the moderate level of noise, a noise level that the agency consulting medical source had cautioned Pruitt to avoid. This internal inconsistency between the tasks identified by the vocational expert and the medical opinion of Dr. Mortimer was not identified by either the vocational expert or the ALJ at the hearing.

This inconsistency, which was unidentified at Pruitt's hearing, remained unresolved in the ALJ's January 8, 2014, opinion denying his claim for benefits. (Tr. 9-19.) That January 8, 2014, decision found that Pruitt suffered from the following severe impairments: degenerative disc disease, lumbar radiculopathy, and profound hearing loss. (Tr. 15.) Due to the combined impact of these impairments, the ALJ concluded that Pruitt was restricted to performing light work with a sit/stand option every 30 minutes, and further found that Pruitt could not hear conversation at a normal level and only perceives 80% of what is spoken at a 100 decibel level. (Id.) Despite these impairments, the ALJ relied upon the vocational expert opinion to conclude that Pruitt could perform the jobs of production work assembler, hand bander, sorter or inserter. (Tr. 19.) The ALJ reached this conclusion while noting

that the vocational expert's testimony was inconsistent with the guidance contained in the Dictionary of Occupational Titles.  The ALJ reconciled this discrepancy by stating that the vocational expert provided a reasonable explanation for that discrepancy.  (Id.)  However, the ALJ's opinion cited only the ways in which the vocational expert reconciled her opinion regarding a sit/stand option with the DOT.  The ALJ did not speak to the discrepancies between the VE's testimony, and either the DOT ambient noise standards for the jobs identified by the VE, or Dr. Mortimer's opinion that Pruitt should avoid jobs like those identified by the VE which had moderate noise levels at work.  The inconsistencies between the vocational expert's opinion as it related to Pruitt's profound hearing loss remained wholly unexamined, and unidentified, in the ALJ's decision.  (Id.)

Having exhausted his administrative appeals, Pruitt has brought this action challenging the Commissioner's determination in this case. (Doc. 1.)  In this appeal, Pruitt focuses on the unidentified, unexamined and unresolved discrepancy between the vocational expert's opinion regarding the disabling effect of his deafness in certain fields, and the opinion of Dr. Mortimer, who recommended that Pruitt avoid the level of noise which the DOT and SCO state are endemic in the jobs identified by the vocational expert.  This matter has been fully briefed by the parties and is now ripe for decision.  (Docs. 15, 18, 19, 22, and 23.)

For the reasons set forth below, this case will be remanded for further consideration of the degree to which Pruitt's profound hearing loss affects his ability to perform the jobs identified by the vocational expert.

## III.   LEGAL STANDARDS

### A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THE ALJ AND THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200(3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536(M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an

adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether plaintiff is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience

and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC.  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work.  42 U.S.C. §423(d)(5); 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §§404.1512, 416.912; Mason, 994 F.2d at 1064.  Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C. Assessing Discrepancies Between Vocational Expert Testimony and DOT Guidance

One of the principal contested issues in this setting often relates to the claimant's residual capacity for work in the national economy. There are several aspects to consideration of an ALJ's reliance on vocational testimony at step five to determine this question. Rutherford v. Barnhart, 339 F.3d 546, 554 n. 8 (3d Cir. 2005). First, on occasion that vocational expert testimony cannot be relied upon because the ALJ failed to convey limitations to the VE that were properly identified in the RFC assessment. Id. In addition, occasionally the VE's testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and thus did not convey those limitations to the VE. Id.

In other instances, the reliability of the VE testimony is undermined because that testimony does not fully reconcile inconsistencies between the DOT guidelines and the expert's opinion. Where a material discrepancy exists between the vocational

expert opinion and the DOT descriptions which is not adequately identified or addressed, a remand is appropriate to allow for development of the record and resolution of the discrepancy. Boone v. Barnhart, 353 F.3d 203, 207 (3d Cir. 2003); Overman v. Astrue, 546 F.3d 456, 465 (7th Cir. 2008). As we have observed: "Where there is an apparent, unresolved conflict between the VE testimony and the DOT with regard to every position identified by the VE, the ALJ's determination that a claimant can perform other work in the national economy lacks substantial evidence" and should be remanded. Meloni v. Colvin, 109 F. Supp. 3d 734, 735 (M.D. Pa. 2015).

>   **D. THIS CASE SHOULD BE REMANDED TO RECONCILE AN UNADDRESSED DISCREPANCY BETWEEN THE VOCATIONAL EXPERT TESTIMONY, THE MEDICAL EVIDENCE AND THE DOT GUIDELINES CONCERNING THE DISABLING IMPACT OF PRUITT'S PROFOUND HEARING LOSS**

In the instant case we find that, notwithstanding the efforts of the ALJ to obtain greater clarity from the vocational expert, there remains an unresolved, unidentified, and unaddressed discrepancy between the VE testimony, the DOT guidelines, and the uncontradicted medical evidence. That medical evidence indicated that due to his profound hearing impairments Pruitt should avoid "even moderate exposure" to noise at work. (Tr. 68.) Yet, the vocational expert testified that Pruitt could work as a production work assembler, hand bander, sorter or inserter. (Tr. 19, 55.) In reaching this conclusion the vocational expert addressed Pruitt's deafness in passing, and in an incomplete fashion, simply stating that: "the details of the profound hearing loss are another issue. In general, of course the DOT discusses it, but not in detail like that." (Id.)

15

This vocational expert testimony seems to be incomplete, inaccurate and inadequate to reconcile the expert's opinion with the DOT standards for several reasons. First, the vocational expert's suggestion that the DOT did not provide meaningful guidance relating to workplace noise levels is incorrect in that it failed to take into account that the Selected Characteristics of the Occupations Defined in the Dictionary of Occupational Titles, (SCO), does address ambient noise requirements for these positions. Second, this VE opinion does not address the fact that the SCO indicates that all of the positions identified by the vocational expert entailed work site noise levels at or beyond the moderate level of noise. Third, this opinion then neglects to consider that these job site noise levels constitute noise levels that the agency consulting medical source expressly cautioned Pruitt to avoid.

These inconsistencies were not identified at the ALJ hearing, and consequently remained unaddressed in the ALJ's decision. Yet the inconsistencies between the VE's testimony, the uncontradicted medical evidence, and the DOT job descriptions are potentially outcome determinative in this case since a finding that the ambient noise levels in these jobs are inconsistent with Pruitt's profound hearing loss would eliminate these positions from the ALJ's consideration. Eliminating these jobs from this disability analysis, in turn, could materially alter that analysis since these were

the only jobs in what the vocational expert conceded were "a narrow range of jobs that's appropriate," (Tr. 54), for Pruitt.

Given these material unanswered questions, we find that "there is an apparent, unresolved conflict between the VE testimony and the DOT with regard to every position identified by the VE, [therefore] the ALJ's determination that a claimant can perform other work in the national economy lacks substantial evidence" and should be remanded. Meloni v. Colvin, 109 F. Supp. 3d 734, 735 (M.D. Pa. 2015). Yet, while case law calls for a remand and further proceedings by the ALJ in this case further assessing this claim under the five-step sequential analysis applicable to such claims, and expressly addressing the discrepancy between the VE opinion, the DOT and this medical evidence, nothing in this report and recommendation should be construed as suggesting what the outcome of that final and full analysis should be. The outcome of that analysis remains the province of the Administrative Law Judge.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, IT IS ORDERED the plaintiff's complaint be REMANDED for further consideration to address and resolve the discrepancy between the VE opinion, the DOT guidelines which describe the jobs identified by the VE as positions which entail workplace noise which is moderate or

greater, and the medical evidence which indicates Pruitt should avoid "even moderate exposure" to noise.

An appropriate order follows.